**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

**Elizabeth Harvey Prybylski**

       v.                                    Case No. 19-cv-500-JL

**Andrew Saul, Commissioner**
**Social Security Administration**

**REPORT AND RECOMMENDATION**

Elizabeth Harvey Prybylski challenges the denial of her applications for disability insurance benefits and supplemental security income pursuant to 42 U.S.C. § 405(g). She contends that the Administrative Law Judge ("ALJ") committed reversible errors at steps three through five of the sequential analysis required by 20 C.F.R. § 404.1520. The Commissioner, in turn, moves for an order affirming the ALJ's decision. Finding no reversible error, the court recommends that the district judge deny Prybylski's motion and grant the Commissioner's motion.

**I.  STANDARD OF REVIEW**

The court is authorized to review the pleadings submitted by the parties and the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner. See 42 U.S.C. § 405(g). That review is limited, however, "to determining whether the [Commissioner] used the proper legal standards and found facts [based] upon the

proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). The court defers to the Commissioner's findings of fact, so long as those findings are supported by substantial evidence. Id. Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

If the Commissioner's factual findings are supported by substantial evidence, they are conclusive, even where the record "arguably could support a different conclusion." Id. at 770. The Commissioner's findings are not conclusive, however, "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam). "Issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Commissioner, and the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [him], not for the doctors or for the courts." Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018) (internal quotation marks and brackets omitted).

## II.    BACKGROUND[1]

### A.    Procedural Facts

Prybylski is a 32-year-old woman with a college degree. She worked part time as a cashier at Home Depot until November 2011.  She has not worked since then.

In June 2013, Prybylski filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").  She claimed disability as of November 15, 2011, due to hypermobility (later diagnosed as Ehlers-Danlos syndrome), back pain, nerve disorder, post-traumatic stress disorder ("PTSD"), and hip bursitis.  After her claims were denied at the initial level, Prybylski testified at a hearing before ALJ Lisa Groeneveld-Meijer in April 2015.  The ALJ denied her claims in May 2015, and the Appeals Council denied her appeal in July 2016.  Prybylski then appealed to the district court.  Then-Acting Commissioner requested a remand in order for the ALJ to conduct a new hearing and re-evaluate the medical opinions in the record.  The district judge granted the motion and remanded the case in February 2017.

Prybylski testified at three post-remand hearings before the same ALJ, between October 2017 and June 2018.  Four

---

[1]    The court provides a brief summary of the relevant facts. A more detailed recitation appears in the parties' statements of material facts (Doc. Nos. 8-2 & 11), which the court incorporates by reference.  See L.R. 9.1(b)-(c).

impartial medical experts and a vocational expert also
testified.  The ALJ subsequently denied Prybylski's claims in
August 2018.  See Administrative Transcript ("Tr.") 816-37.  The
Appeals Council denied her appeal in March 2019, rendering the
ALJ's decision the final decision of the Commissioner.  See Tr.
806-12.  Prybylski again appeals.

**B.   Prybylski's Testimony**

Prybylski testified that she had suffered physical,
emotional, and sexual abuse at the hands of her father.  Tr.
891-92, 965.  As a result, she experiences anxiety and panic
attacks triggered by "male voices, particularly loud ones,"
criticism, aggression, or conflict.  Tr. 891, 967.  She
clarified that she need only "perceive" criticism or anger in
order to be triggered.  Tr. 891, 967.  She also gets "very
anxious and stressed when [she is] around people" and cannot "be
around people [she does not] know very well."  Tr. 965.  Because
her father beat her more severely if she showed emotion, she
developed an ability to hide her feelings for a short period of
time.  Tr. 965, 968.  Prybylski also testified that she has
severe pain, including muscle spasms, back pain, nerve pain,
migraine headaches, and joint problems.  Tr. 893, 969.

On a typical day, she rests on the couch or bed most of the
time and watches Netflix on her laptop.  Tr. 895.  On better
days, which occur once or twice a week, she may go to the

grocery store, fold laundry, play the violin, or write.  Tr.
898, 973-74.  She attends church about twice a month and
performs in the church band, singing or playing the violin for
3-to-5 minutes at a time during an hour-long service.  Tr. 167-
68.  At one point, she served as a deacon of her church but
eventually stepped down because she missed too many meetings.
Tr. 168-69.

Prybylski testified that she performs Tai Chi, which she
described as a non-contact martial art consisting of a slow,
controlled series of movements, for 10-15 minutes once or twice
a week.  Tr. 170.  She stopped Japanese sword fighting, another
non-contact form of martial arts, prior to applying for
disability.  Tr. 170, 972.

### C.   Medical Opinion Evidence

#### 1.   Mental Impairments

During the relevant time period, Prybylski received
counseling from two pastoral therapists, Reverend Ruth Bersin,
D. Min., Ph.D., and Ara Heghinian, D. Min.  Dr. Bersin, who
treated her from 2009 until 2015, wrote three letters and
completed two forms on Prybylski's behalf.  In January 2013, she
wrote in a letter that aggressive behavior from anyone may cause
Prybylski to withdraw, and that "critical, negative, controlling
and aggressive behavior is a trigger for her traumatic memories
of abuse by her father."  Tr. 691.  Dr. Bersin noted that

5

Prybylski completed college and worked in a department store during the course of their counseling relationship.  Tr. 691. According to Dr. Bersin, Prybylski "was forced, due to [back] pain, to leave [her] job . . . due to the need for standing all day long."  Tr. 691.  She also stated that Prybylski needed disability benefits "while she gets her pain under control." Tr. 691.

In May 2013, Dr. Bersin completed a mental residual functional capacity questionnaire and a medical source statement of ability to work.  See Tr. 721-26, 728-30.  She indicated that Prybylski had extreme limitations in her abilities to perform at a consistent pace, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers, and deal with normal work stress.  Tr. 723.  Dr. Bersin assessed marked limitations in her abilities to remember work-like procedures, understand and remember very short and simple instructions, maintain attention for two-hour segments, maintain regular attendance and punctuality, and complete a normal workday and workweek without interruptions from psychologically based symptoms.  Tr. 723.  According to Dr. Bersin, Prybylski's impairments would cause her to be absent from work more than four days per month.  Tr. 725.

In a letter dated May 2, 2014, Dr. Bersin explained that Prybylski "tends to push herself to function at a high level in

6

the face of difficult experiences," which has led to depression, flash backs, and panic attacks.  Tr. 736.  She also wrote, "in an initial meeting [Prybylski] may come across as highly functioning."  Tr. 736.

Dr. Bersin submitted her final letter in October 2017.  She asserted that it took her a long time to understand Prybylski's issues because it was "very difficult to break down her outer protective shell."  Tr. 1653.  Dr. Bersin added that "it was easier for [Prybylski] to speak about physical pain than emotional pain," and that "[t]here were no doubt psychological issues in addition to physical issues" that caused her to leave her job at Home Depot.  Tr. 1653.  According to Dr. Bersin, once triggered, Prybylski could "hold it together for a brief period of time" but could not do so for an entire workweek.  Tr. 1653.  She then opined that it "would be intolerable for [Prybylski] to be in the same room with other workers all of whom were working independently if she could hear their conversation, especially if any of the other workers were men."  Tr. 1653.

Mr. Heghinian began counseling Prybylski in August 2016. In September 2017, he opined that she was totally precluded from working appropriately with either the public or co-workers stationed in close proximity, handling conflicts, responding to criticism, maintaining appropriate social interactions, staying on task for two-hour periods, working at an appropriate and

consistent pace, sustaining regular work attendance, working a full day without non-standard breaks, regulating her emotions and behavior in a work setting, and managing her psychologically based symptoms. Tr. 1602-03. Mr. Heghinian explained in a letter that Prybylski's PTSD and social anxiety symptoms prevented her from being effective in a work setting. Tr. 1597. Her PTSD was triggered, he explained, "especially with men who show aggression or sternness," and her anxiety leads to debilitating migraines that incapacitate her and confine her to her home. Tr. 1597.

Psychological consultative examiner Darlene Gustavson, Psy.D., examined Prybylski for almost an hour in February 2013. Tr. 693. Prybylski scored 27/30 on the Folstein Mini Mental Status Exam. Tr. 695. Dr. Gustavson opined that she was able to complete activities of daily living, interact and communicate with others, understand and remember detailed instructions, maintain attention and concentration to complete tasks, make at least simple decisions, maintain attendance, and interact with supervisors. Tr. 696-97. Seven months later, another psychological consultative examiner, Juliana Read, Ph.D., met with Prybylski for about an hour, recorded a score of 28/30 on the Folstein Mini Mental Status Exam, and arrived at nearly identical conclusions about her functioning. See Tr. 731-34.

Billings Fuess, Ph.D., a clinical psychologist and former professor of psychology, reviewed Prybylski's records and testified as an impartial medical expert at two of her post-remand hearings.  Dr. Fuess opined that her mental impairments did not meet or equal any listing.  Tr. 918.  According to Dr. Fuess, her impairments caused mild limitations in understanding, remembering or applying information, and moderate restrictions in social interactions, ability to maintain concentration, persistence, or pace, and ability to adapt or manage herself. Tr. 920-21.  He found most persuasive the opinions of the two consultative examiners, Drs. Gustavson and Read.  Tr. 921.  Dr. Bersin's opinions were less persuasive to Dr. Fuess because he believed they were contradicted by the therapist's own treatment notes.  Tr. 922-23, 927-28.

Norman Strahl, M.D., also testified as an impartial medical expert at one of the post-remand hearings.  Like Dr. Fuess, he opined that Prybylski's mental impairments did not meet or equal a listing.  Tr. 998.  According to Dr. Strahl, she would be able to interact appropriately with supervisors, interact with coworkers for 70% of the workday, interact with the public for 50% of the workday, and perform both simple and complex tasks. Tr. 1000.  Dr. Strahl testified that he was "quite surprised" to learn that Prybylski had worked as a cashier at Home Depot, considering Dr. Bersin's opinion that she "would have a great

difficulty dealing with public or people around her."  Tr. 998.
He also found that Dr. Bersin's January 2013 letter stating that
Prybylski stopped working because of pain contradicted her later
assertions that extreme psychological limitations were the
cause.  Tr. 999.  Dr. Strahl found it significant that Drs.
Gustavson and Read arrived at essentially the same conclusions
concerning Prybylski's mental functioning based on separate
examinations.  Tr. 999.

### 2.  Physical Impairments

Craig Widness, M.D., began to treat Prybylski in March
2013.  Between May 2014 and July 2017, the doctor provided four
opinions concerning Prybylski's limitations.  Two were checklist
assessments of her functional limitations, see Tr. 737-40, 802-
05, and the remaining two were short letters stating that she
was "unable to return to work" because of unspecified "medical
reasons."  Tr. 1592, 1593.  In his functional assessments, Dr.
Widness opined that Prybylski could lift less than ten pounds,
sit for ten minutes at a time for a total of two hours, stand
for five minutes at a time for a total of two hours, and walk
for ten minutes at a time for a total of one hour, with the
maximum combined ability to sit, stand or walk of four hours.
Tr. 737, 802.  He also opined that she could never balance,
stoop, kneel, crouch, or crawl, and could use her hands and feet
for just four hours.  Tr. 738-39, 803-04.  According to Dr.

Widness, Prybylski was likely to miss work more than four days
every month due to her impairments.  Tr. 740, 805.  He based his
opinions on Prybylski's joint hypermobility syndrome, suspected
fibromyalgia, and arthralgias in knees, hips and back.  Tr. 740,
805.

Daniel Albert, M.D., a rheumatologist, began to treat
Prybylski in March 2016.  In a letter dated July 11, 2017, Dr.
Albert wrote that Prybylski has Ehlers-Danlos syndrome type III
with recurrent dislocations, fibromyalgia, Postural Orthostatic
Tachycardia syndrome ("POTS"), migraines, gastroesophageal
reflux disease, and insomnia.  Tr. 1649.  He opined that
Prybylski was "disabled from conventional work by the joint pain
and POTS as that leaves her unable to sit or stand for long
periods of time."  Tr. 1649.  Because of her symptoms, Dr.
Albert believed that Prybylski was "significantly limited to
several hours of work a day" and required the ability to
frequently change her position.  Tr. 1649.  In a letter dated
August 4, 2017, he wrote that she could not work for longer than
four hours per day, required the flexibility to sit, stand, or
walk as needed for her comfort, and could not lift more than ten
pounds.  Tr. 1508.

John Pella, M.D., testified as an impartial medical expert
at one of Prybylski's post-remand hearings.  He opined that her
physical impairments did not meet or equal any listing.  Tr.

11

901.  According to Dr. Pella, Prybylski's impairments limited her to lifting and carrying ten pounds, sitting for one hour at a time for up to six hours, standing for 30 minutes at a time for up to two hours, and walking for 30 minutes at a time for up to two hours.  Tr. 904.  He also opined that she could occasionally use her arms for pushing and pulling and frequently for reaching, could occasionally balance, stoop, and kneel, but could never crouch, crawl, or climb ladders.  Tr. 905-06.

Stephen Kaplan, M.D., also testified as an impartial medical expert at a post-remand hearing.  He likewise opined that Prybylski's physical impairments did not meet or equal any listing.  Tr. 979.  According to Dr. Kaplan, she could perform sedentary work and use her upper extremities frequently, but she could not climb ladders or ropes nor be exposed to excess cold or unprotected heights.  Tr. 980-82.

D.    **The ALJ's Decision**

The ALJ assessed Prybylski's claims under the five-step, sequential analysis required by 20 C.F.R. § 404.1520.[2]  At step one, she found that Prybylski had not engaged in substantial gainful activity since November 15, 2011, her alleged disability onset date.  Tr. 822.  At step two, the ALJ found that

---

[2]    The court cites to the regulations applicable to DIB claims.  The analogous regulations applicable to SSI claims contain the same requirements.  See 20 C.F.R. § 416.901 et seq.

Prybylski's PTSD, anxiety, depressive disorder, Ehlers-Danlos
syndrome, fibromyalgia, lumbar spondylosis, right knee
impairment, and asthma qualified as severe impairments.  Tr.
822.  At step three, the ALJ determined that none of those
impairments, considered individually or in combination,
qualified for any impairment listed in 20 C.F.R. Part 404,
Subpart P, Appendix 1.  Tr. 822-25.

The ALJ then found that Prybylski had the residual
functional capacity ("RFC") to perform sedentary work as defined
in 20 C.F.R. § 404.1567(a), except that she needed the ability
to take brief breaks during non-break hours to walk away from
the work station, could stand or walk for 30 minutes at a time
for up to two hours, and could occasionally push, pull, balance,
stoop, kneel, and climb ramps and stairs.  She could not crouch,
crawl, or climb ladders, ropes or scaffolds, nor could she be
exposed to a variety of hazards and environmental irritants.
The ALJ also found that Prybylski could perform routine and
repetitive tasks with few, if any, changes and could have brief
and routine interactions with supervisors and co-workers.
Lastly, she was limited to work that did not require interaction
with the general public, tandem tasks, or fast pace.  Tr. 825.

The ALJ gave "great weight" to the opinions of Drs. Fuess
and Pella and "significant weight" to the opinions of Drs.
Kaplan and Strahl, all of whom testified as impartial medical

experts.  The opinions of examining psychologists Drs. Gustavson and Read were also given "great weight."  The ALJ gave "limited weight" to Dr. Bersin's opinion and "little weight" to Mr. Heghinian's opinion concerning Prybylski's mental functioning. Finally, the ALJ gave "little weight" to the opinions of treating physician Dr. Widness and treating rheumatologist Dr. Albert regarding Prybylski's physical limitations.[3]  Tr. 828-34.

Relying on the testimony of a vocational expert, the ALJ then found at step four that Prybylski could not perform her past relevant work as a cashier, boat rental clerk, cleaner, or karaoke host.  Tr. 835.  At step five, however, the ALJ found that jobs existed in significant numbers in the national economy that Prybylski could perform, such as a surveillance system monitor, addresser, and fishing-reel assembler.  Tr. 836. Accordingly, the ALJ concluded that Prybylski was not disabled from November 15, 2011, her alleged disability onset date, through the date of the ALJ's decision.  Tr. 837.

### III.  ANALYSIS

Prybylski alleges that four errors in the ALJ's decision warrant remand.  First, she argues that the ALJ improperly determined at step three of the sequential analysis that her

---

[3]    The ALJ evaluated additional medical opinions in the record.  As Prybylski does not challenge the ALJ's weighing of those opinions, the court does not address them.

mental impairments did not met or equal a listed impairment.
Second, she contends that the ALJ failed to properly evaluate
her complaints of pain.  Third, she maintains that the ALJ
improperly weighed certain medical opinions in the record.
Finally, she challenges the ALJ's reliance on vocational expert
testimony.  The court addresses each argument in turn and
concludes that none has merit.

> **A.    Step Three Evaluation**

At step three of the sequential analysis, the ALJ found
that Prybylski's mental impairments did not meet or equal a
listed impairment.  Substantial evidence supports the ALJ's
finding.

An ALJ will find a claimant disabled at step three if the
claimant has an impairment that meets the duration requirement
and is listed in 20 C.F.R. Pt. 404, Subpart P, Appendix 1, or is
medically equivalent to a listed impairment.  See 20 C.F.R.
§§ 404.1520(d), 404.1525, 404.1526.  The claimant bears the
burden to show that she has an impairment or a combination of
impairments that meets or equals a listed impairment.  Torres v.
Sec'y of Health & Human Servs., 870 F.2d 742, 745 (1st Cir.
1989) (per curiam).

The listed impairments that Prybylski claims she meets are
listings 12.06 and 12.15.  Listing 12.06 pertains to anxiety
disorders, whereas listing 12.15 relates to trauma and stress

15

related disorders.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1,
§§ 12.06, 12.15.  Both listings have three paragraphs,
designated A, B, and C.  Id. § 12.00(A)(2).  Prybylski argues
that her impairments meet the paragraph B criteria, which is
shared by both listings.  To satisfy the paragraph B criteria, a
mental disorder must result in "extreme" limitation of one, or
"marked" limitation of two, of the following four areas of
mental functioning: (1) understanding, remembering, or applying
information; (2) interacting with others; (3) concentrating,
persisting, or maintaining pace; and (4) adapting or managing
oneself.  Id. §§ 12.00(A)(2)(b), 12.06(B), 12.15(B).

     The ALJ supportably found that Prybylski had only moderate
limitations in each of the four areas.  Regarding understanding,
remembering, or applying information, the ALJ relied upon the
results of Prybylski's Folstein Mini Mental Status Exam that
indicated no cognitive impairment, as well as the opinions of
Drs. Gustavson and Read, both of whom examined Prybylski and
opined that she had no difficulty in this area.  Tr. 824.  In
addition, Dr. Fuess testified that Prybylski had only a mild
limitation in the area, and Dr. Strahl similarly concluded that
she could perform detailed and complex tasks.  See Tr. 920-21,
1000.  As discussed below, the ALJ's decision to discount the
opinions of Prybylski's therapists that she was extremely
limited in her cognitive abilities is supported by the record.

Substantial evidence likewise supports the ALJ's finding of a moderate limitation in Prybylski's ability to interact with others.  Despite her alleged extreme difficulty being around others, especially men, the ALJ noted that she lives with her husband and family, has periodic visits from friends, served as a deacon in her church, attends church, and performs in the church band as a singer and violinist.  Tr. 824.  Consistent with the ALJ's finding, Dr. Fuess testified that Prybylski's limitations were no more than moderate in this area.  See Tr. 920-21.  And Dr. Strahl opined that she could interact with supervisors, interact with co-workers 70% of the time, and interact with the public 50% of the time.  Tr. 1000.

The ALJ's finding of a moderate limitation in the third criteria, the ability to concentrate, persist, or maintain pace, finds support in Prybylski's activities of daily living.  The ALJ noted that she plays the violin and sings at church, watches Netflix for hours, plays video games, and writes in a journal. Tr. 824.  Further, Dr. Fuess testified that her limitations in this area were moderate, and both Drs. Gustavson and Read opined based on their examinations that Prybylski could maintain attention and concentration to complete tasks.  See Tr. 920-21, 696-97, 731-24.

In terms of adapting or managing oneself, the ALJ cited Prybylski's reported abilities to care for her personal needs,

17

prepare light meals, make the bed, fold laundry, dust, care for
her pet, and do occasional grocery shopping.  Tr. 824.  The
ALJ's finding of a moderate limitation in this area is also
consistent with Dr. Fuess' opinion.  See Tr. 920-21.

Finally, it bears noting that Drs. Fuess and Strahl both
opined that Prybylski's impairments did not meet or equal either
listing 12.06 or 12.15.  See Tr. 918-20, 998-1000.  As discussed
below, substantial evidence supports the ALJ's decision to
credit their opinions.

**B.  Evaluation of Subjective Complaints**

Prybylski next argues that the ALJ did not properly
evaluate her complaints of pain.  The court concludes that the
ALJ supportably discounted her subjective reports regarding the
severity of her pain as not entirely consistent with the medical
evidence and other evidence in the record.

In crafting a claimant's RFC, an ALJ must consider all of
the claimant's alleged symptoms and determine the extent to
which those symptoms can reasonably be accepted as consistent
with objective medical evidence and other record evidence.  20
C.F.R. § 404.1529(a); SSR 16-3p, 2016 WL 1119029, at *2 (Mar.
16, 2016).  This involves a two-step inquiry.  First, the ALJ
must determine whether the claimant has a "medically
determinable impairment" that could reasonably be expected to
produce her alleged symptoms.  SSR 16-3p, 2016 WL 1119029, at

*3.  Second, the ALJ evaluates "the intensity, persistence, and limiting effects of [those] symptoms" to determine how they limit the claimant's ability to perform work-related activities. Id. at *4.  The ALJ must "examine the entire case record" in conducting this evaluation, including objective medical evidence, the claimant's own statements and subjective complaints, and any other relevant evidence in the record.  Id.; see Coskery v. Berryhill, 892 F.3d 1, 4 (1st Cir. 2018).

The ALJ cannot disregard the claimant's statements about her symptoms solely because they are unsubstantiated by objective medical evidence.  See SSR 16-3p, 2016 WL 1119029, at *5.  Rather, an inconsistency between subjective complaints and objective medical evidence is just "one of the many factors" to consider in weighing the claimant's statements.  Id.

Other factors the ALJ must consider are: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of any pain or symptom; (3) any precipitating and aggravating factors; (4) the effectiveness of any medication currently or previously taken; (5) the effectiveness of non-medicinal treatment; (6) any other self-directed measures used to relieve pain; and (7) any other factors concerning functional limitations or restrictions.  Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 29 (1st Cir. 1986); see 20 C.F.R. § 404.1529(c)(3).  But the ALJ is not required to address every

Avery factor in her written decision. Deoliveira v. Berryhill,
2019 DNH 001, 2019 WL 92684, at *5 (D.N.H. Jan. 2, 2019).
Instead, the decision need only "contain specific reasons for
the weight given to the individual's symptoms, be consistent
with and supported by the evidence, and be clearly articulated
so the individual and any subsequent reviewer can assess how the
adjudicator evaluated the individual's symptoms." SSR 16-3p,
2016 WL 1119029, at *9.

Prybylski testified that pain caused by the Ehlers-Danlos
syndrome and related ailments generally requires her to
alternate between sitting and lying down all day, and that her
mental health symptoms severely limit her abilities to function
and interact with other people.  The ALJ found that Prybylski's
impairments could produce the alleged symptoms but discounted
her testimony as to their severity.  First, the ALJ reasoned
that the objective medical evidence does not substantiate her
testimony.  As to her physical condition, the ALJ cited
treatment records showing generally intact gait, reflexes,
sensation, and motor strength; a treating physician's notation
that her fibromyalgia was mild and that she did not require the
use of a cane; and negative neurological testing.  See Tr. 827.
Regarding her mental ailments, the ALJ cited treatment notes
documenting mostly normal mental status exams and no more than
moderate symptoms of anxiety and PTSD.  See Tr. 828.  Although

Prybylski correctly points out that there are records that support her testimony, conflicts in the evidence are for the ALJ to resolve.  See Purdy, 887 F.3d at 13.

Second, the ALJ found that Prybylski's activities of daily living were inconsistent with her subjective complaints.  The ALJ noted that she reported going out to dinner and the movies, having friends over, going to church, playing the violin and singing in her church band, and performing martial arts.  Tr. 828.  As the ALJ noted elsewhere in the decision, Prybylski also reported that she was able to care for her personal needs, prepare light meals, make the bed, fold laundry, dust, care for her pet, and do occasional grocery shopping.  Tr. 824.  Although she later stopped, she was also teaching Japanese sword fighting after her alleged disability onset date.  Tr. 828; see Tr. 438.

Third, the ALJ considered the effectiveness of her treatment, citing records showing that she was "pleased" with her response to medication for muscle aches.  Tr. 828.  The Appeals Council also noted that she refused some methods of pain control.  Tr. 807.  The cited records confirm that she declined opioid treatment and failed to follow her provider's suggestion to try a particular type of physical therapy.  See Tr. 1921, 1927.  In sum, the record supports the ALJ's decision to discount Prybylski's statements concerning the intensity, persistence, and limiting effects of her pain and anxiety.

**C.   Evaluation of Medical Opinions**

An ALJ must consider "medical opinions" provided by both treating and non-treating "acceptable medical sources," "together with the rest of the relevant evidence." 20 C.F.R. § 404.1527(a)-(b) (effective for claims filed before March 27, 2017); see SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996).  In addition, the ALJ must address each medical opinion and explain why those that conflict with the RFC assessment were not adopted. SSR 96-8p, 1996 WL 374184, at *7.

The regulations define "medical opinions" as "statements from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite impairment(s), and [her] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1).  When weighing a medical opinion, an ALJ must consider, inter alia, the nature of the relationship between the medical source and the claimant, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the source of the opinion is a specialist.  See id. § 404.1527(c).

The ALJ must give "good reasons" for the weight assigned to a treating provider's opinion.  See id. § 404.1527(c)(2).  Such opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory

22

diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. § 404.1527(c)(2). "And even if not deemed controlling, a treating physician's opinion is entitled to weight that reflects the physician's opportunity for direct and continual observation." Purdy, 887 F.3d at 13. As explained below, the court finds no error in the ALJ's evaluation of the medical source opinions that Prybylski challenges.

### 1. Dr. Fuess

The ALJ assigned "great weight" to the opinion of impartial medical expert Dr. Fuess, who testified that Prybylski's mental impairments at most cause moderate difficulties in her functioning. The ALJ's assessment is supported by evidence that is "adequate" to persuade "a reasonable mind." See Irlanda Ortiz, 955 F.2d at 769 (internal quotation marks omitted).

The ALJ reasoned that Dr. Fuess is a psychologist specializing in anxiety and trauma disorders who understands the Social Security disability regulations, heard Prybylski's testimony, reviewed the full evidence of record, and whose opinion was consistent with that record. Tr. 829. Those are permissible reasons for assigning great weight to the opinion. See 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."); id. § 404.1527(c)(5)

23

("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."); id. § 404.1527(c)(6) ("[T]he amount of understanding of our disability programs and their evidentiary requirements that a medical source has . . . and the extent to which a medical source is familiar with the other information in [a claimant's] case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.").

Dr. Fuess also presented relevant evidence to support his medical opinion.  See id. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion.").  He cited the consultative examinations that Drs. Gustavson and Read performed, which showed only mild or moderate limitations in Prybylski's mental functioning and yielded nearly identical scores on the Folstein Mini Mental Status Exam.  Tr. 920–21. Dr. Fuess also noted that generally normal mental status findings in Dr. Bersin's treatment notes, such as normal mood, affect, mental status, sleep quality, and eager participation, supported his opinion.  Tr. 922.  According to Dr. Fuess, those findings undermined Dr. Bersin's opinions that Prybylski had extreme or marked limitations in her mental functioning.  Tr.

24

922.  He also testified that the Global Assessment of Functioning ("GAF") scores recorded in her treatment notes were inconsistent with Dr. Bersin's normal mental status findings and ultimate recommendations.  Tr. 922-23; see, e.g., Tr. 616-19. Further, Dr. Fuess explained that Prybylski's alleged inability to accept criticism from superiors or work in a setting where she could overhear her male co-workers was not well documented in Dr. Bersin's notes.  Tr. 927.  In the absence of contemporaneous corroboration, it appeared to Dr. Fuess that Dr. Bersin's opinions relied instead on Prybylski's subjective statements.  Tr. 928.  Given that Dr. Fuess' opinion on these issues is both supportable and consistent with the record, the ALJ was entitled to credit his opinion over Dr. Bersin's.[4]

Prybylski does not argue that Dr. Fuess misread Dr. Bersin's notes.  Instead, she offers reasons why those notes are not necessarily inconsistent with Dr. Bersin's opinions.  But it is not the court's function to substitute its judgment for the ALJ's where the record adequately supports the ALJ's evaluation of a medical opinion, as it does here.

_____

[4]    Contrary to Prybylski's suggestion, Leach v. Astrue, 2012 DNH 128, 2012 WL 3263591, at *5 (D.N.H. Aug. 9, 2012), is not on point.  There, the therapist supplemented his sparse treatment notes with a narrative discussing the bases for his opinions, but the testifying medical expert did not have the benefit of those explanations.  See id.  By contrast, Dr. Fuess concluded that Dr. Bersin's opinions were not well founded after reviewing all of her letters, assessments, and treatment notes.

2.    Dr. Strahl

The ALJ gave "significant weight" to the opinion of Dr. Strahl, who testified as an impartial medical expert.  He opined that Prybylski could complete complex tasks and interact appropriately with supervisors, co-workers, and the public for considerable portions of the workday.  Tr. 1000.  The ALJ reasoned that Dr. Strahl had medical expertise, knowledge of Social Security disability regulations, and the opportunity to hear Prybylski's testimony and review all of the medical records.  Tr. 830-31; see 20 C.F.R. § 404.1527(c)(4)-(6) (listing these as relevant factors when weighing medical opinions).  The ALJ noted that her RFC assessment is more restrictive, however, in line with Dr. Fuess' opinion, which was more recent and more persuasive to the ALJ.  Tr. 831.

Dr. Strahl's opinion is adequately supported by the record evidence.  See 20 C.F.R. § 404.1527(c)(3).  Like Dr. Fuess, Dr. Strahl was most persuaded by the opinions of the consultative examiners that Prybylski could get along with others and do some work and the fact that their testing produced consistent results.  Tr. 999.  He found Dr. Bersin's opinions unpersuasive. According to Dr. Strahl, Prybylski's work with the public at Home Depot demonstrated that she was not as limited as Dr. Bersin later opined.  He also found that Dr. Bersin's January 2013 letter stating that Prybylski stopped working because of

back pain contradicted her later assertions of extreme

psychological limitations.   Tr. 998-99.

Prybylski argues that Dr. Strahl's opinion is based on a

faulty understanding of the facts.   First, she points to Dr.

Bersin's letter that postdates Dr. Strahl's testimony, which

states that psychological issues did contribute to her inability

to continue working at Home Depot.   See Tr. 1653.   Prybylski

also claims that Dr. Bersin's treatment notes support this view.

Second, she notes that her own testimony that she was reducing

her hours at Home Depot and frequently called out shows that she

could not work successfully with the public, her supervisors or

co-workers there.   At most, however, there is conflicting

evidence on these issues.   The fact that Dr. Strahl found more

persuasive the evidence that is unfavorable to Prybylski does

not render his opinion unsupported or his understanding of the

facts faulty.

Similarly, Prybylski's claim that Dr. Strahl was biased

because he testified that a treating provider is more likely to

render opinions supportive of a patient's disability claim is

insufficient to challenge the ALJ's weighing of his opinion.

Dr. Strahl did not reject Dr. Bersin's opinion on this basis.

Instead, he articulated supportable reasons why he found the

therapist's opinion unpersuasive.   In any event, the ALJ's

decision does not endorse Dr. Strahl's view about the general

reliability of treating source opinions.  Cf. Cross v. Colvin,
No. 15-CV-331-PB, 2016 WL 8732381, at *7 (D.N.H. Apr. 4, 2016),
R. & R. adopted, 2016 WL 8716257 (D.N.H. Apr. 29, 2016)
(recommending remand where the ALJ discounted favorable treating
source opinions as "advocacy opinions" without support in the
record that their opinions were biased).

### 3.  Dr. Bersin

The ALJ gave "limited weight" to Dr. Bersin's opinions that
Prybylski suffered extreme or marked limitations in her mental
functioning.  Substantial evidence supports the ALJ's
evaluation.

As the Commissioner notes, Dr. Bersin is not an "acceptable
medical source" and thus her opinions are not entitled to
controlling weight or deference.  Dr. Bersin, who holds a Doctor
of Philosophy degree and serves as a pastoral psychotherapist,
is not a licensed or certified psychologist.  See 20 C.F.R.
§ 404.1502(a)(2).  As a therapist, Dr. Bersin qualifies as a
medical source who is not an "acceptable medical source."  See
SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).  Although an
ALJ is instructed to consider the same factors when evaluating
opinions from both acceptable and non-acceptable medical
sources, she is not required to give "good reasons" to discount
the latter.  See 20 C.F.R. § 404.1527(c),(f).  Instead, the ALJ
generally should explain the weight given to non-acceptable

medical source opinions or otherwise ensure that her discussion
of the evidence makes her reasoning apparent. See id.
§ 404.1527(f)(2); SSR 06–03p, 2006 WL 2329939, at *6.

The ALJ reasoned that Dr. Bersin's opinions appear to rely
upon Prybylski's subjective reports rather than clinical
findings. Tr. 832. A claimant's "subjective complaints are not
entitled to greater weight simply because they appear in her
physician's notes." Ford v. Barnhart, 2005 DNH 105, 2005 WL
1593476, at *8 (D.N.H. July 7, 2005). As discussed above, Dr.
Fuess came to the same conclusion as the ALJ because Dr.
Bersin's recommendations were inconsistent with her own
treatment records, which reflect normal mental exam findings.
Further, as the ALJ noted, instead of identifying specific
clinical findings that supported her opinion, Dr. Bersin merely
listed symptoms that her "client reports." See Tr. 721, 832.

The ALJ also gave limited weight to Dr. Bersin's opinions
because of inconsistencies. See Tr. 832-33. For example, her
May 2013 assessment that Prybylski had marked or extreme mental
limitations in the workplace came only four months after Dr.
Bersin wrote in a letter that Prybylski stopped working due to
back pain and that this was the reason she needed disability
support. See Tr. 691. In the same letter, Dr. Bersin
highlighted the fact that Prybylski was able to finish college
and work at Home Depot until her back pain became debilitating,

29

and stated that "she would eagerly take a job and be successful"
once "she gets her pain under control." Tr. 691. Lastly, the
ALJ noted that Dr. Bersin's opinions were inconsistent with
Prybylski's reported activities, including attending church,
playing the violin and singing in the church band, and serving
as a deacon during the relevant time period. Tr. 833. The
ALJ's decision to discount Dr. Bersin's opinions is therefore
sufficiently articulated and supported by the record.

### 4. Mr. Heghinian

The ALJ gave "little weight" to the opinion of pastoral
therapist Mr. Heghinian. Like Dr. Bersin, Mr. Heghinian is not
an acceptable medical source whose opinion may be entitled to
deference. See 20 C.F.R. § 404.1502(a)(2). The ALJ adequately
explained her reasons for giving little weight to his opinion.

The ALJ reasoned that Mr. Heghinian's assessments were
"somewhat conclusory," with minimal evidence cited to support
his conclusions. Tr. 833. The record supports the ALJ's
evaluation. Although he wrote a two-page letter reportedly
summarizing his therapy sessions with Prybylski, Mr. Heghinian
did not submit his treatment notes to the agency. See Tr. 1597-
98. And instead of listing clinical findings to support his
opinion, he wrote that his "client describes" various symptoms
of anxiety, depression and PTSD. See Tr. 1600. The ALJ also
concluded that Mr. Heghinian's opinion was inconsistent with the

mild-to-moderate symptoms recorded in Dr. Bersin's notes and Prybylski's activities discussed above. See Tr. 833. Hence, the challenge to the ALJ's weighing of this opinion fails.

### 5.  Dr. Pella

In assessing Prybylski's physical impairments, the ALJ gave "great weight" to the opinion of Dr. Pella, who testified as an impartial medical expert and opined that Prybylski could perform a limited range of sedentary work. The ALJ reasoned that Dr. Pella has expertise in internal and pulmonary medicine, as well as knowledge of Social Security disability regulations. Tr. 829-30; see 20 C.F.R. § 404.1527(c)(5)-(6). The ALJ also found his opinions consistent with Prybylski's medical records and adequately supported. Tr. 830; see 20 C.F.R. § 404.1527(c)(3)-(4). For example, Dr. Pella testified that Prybylski's diagnosis based on hypermobility is the mildest form of the Ehlers-Danlos syndrome and is usually treated through physical therapy; the imaging of her back and hip did not reveal significant abnormalities; her gait was generally recorded as normal and her lower extremity strength was unimpaired; and her rheumatologist characterized her fibromyalgia as mild. See Tr. 902-04.[5] In addition, the ALJ noted that Prybylski's reported

---

[5]    The ALJ cited records showing mild-to-moderate symptoms of anxiety and PTSD. This suggest a scrivener's error, as those pertain to Prybylski's mental health.

activities, discussed above, were consistent with Dr. Pella's
opinion.  Tr. 830.  Because substantial evidence supports the
ALJ's evaluation of Dr. Pella's opinion, it is entitled to
deference.[6]

### 6.  Dr. Kaplan

The ALJ assigned "significant weight" to the opinion of
testifying impartial medical expert Dr. Kaplan that Prybylski
could perform sedentary work, with some limitations.  The ALJ
reasoned that Dr. Kaplan has expertise in rheumatology and
internal medicine and knowledge of Social Security disability
regulations.  Tr. 830.  In addition, the ALJ concluded that his
opinion was consistent with the record evidence, Dr. Pella's
opinion, and Prybylski's reported activities.  Tr. 830.  Those
reasons are adequate to account for the weight she assigned to
Dr. Kaplan's opinion and find substantial support in the record
evidence discussed above.  See 20 C.F.R. § 404.1527(c).

Prybylski contends that Dr. Kaplan's opinion is not
entitled to significant weight because he did not review the
full set of treatment notes submitted by her treating
rheumatologist Dr. Albert.  It can be reversible error for an
ALJ to rely on an opinion of a non-examining consultant who has
not reviewed the full medical record.  Brown v. Colvin, 2015 DNH

---

[6]    Prybylski's argument that Dr. Pella was biased fails for
the same reasons as her argument concerning Dr. Strahl's bias.

141, 2015 WL 4416971, at *3 (D.N.H. July 17, 2015); Ferland v. Astrue, 2011 DNH 169, 2011 WL 5199989, at *4 (D.N.H. Oct. 31, 2011).  But "the fact that an opinion was rendered without the benefit of the entire medical record does not, in and of itself, preclude an ALJ from giving significant weight to that opinion." Meldrem v. Colvin, 2017 DNH 096, 2017 WL 2257337, at *2 (D.N.H. May 23, 2017) (quoting Coppola v. Colvin, 2014 DNH 033, 2014 WL 677138, *8 (D.N.H. Feb. 21, 2014)).  The ALJ may rely on such an opinion "where the medical evidence postdating the reviewer's assessment does not establish any greater limitations, or where the medical reports of claimant's treating providers are arguably consistent with, or at least not 'clearly inconsistent' with, the reviewer's assessment."  Id. (quoting Ferland, 2011 WL 5199989, at *4).

Dr. Kaplan testified at a hearing in October 2017, based on a record that included extensive evidence from Prybylski's treating providers, including some treatment notes from Dr. Albert.  Prybylski "has not shown what later medical evidence undermines" Dr. Kaplan's opinion.  See Robar v. Astrue, 2011 DNH 110, 2011 WL 2729197, at *8 (D.N.H. July 13, 2011).  She merely asserts that Dr. Kaplan "did not have the benefit of seeing the majority of Dr. Albert's notes."  Doc. No. 8-1 at 9.  She does not identify the unreviewed notes or demonstrate how clinical findings in those notes could have altered Dr. Kaplan's opinion.

In any event, the ALJ considered "additional evidence received since the time of Dr. Kaplan's testimony," and the list of exhibits attached to the ALJ's decision includes the full set of Dr. Albert's notes.   See Tr. 830, 844-46.   The ALJ included additional restrictions into the RFC assessment in light of the subsequent evidence and the opinion of Dr. Pella, who had the benefit of reviewing the full record and whose opinion the ALJ found more persuasive.   See Tr. 830.[7]   The ALJ's reliance on Dr. Kaplan's opinion thus does not require remand.   See Byron v. Saul, 2019 DNH 131, 2019 WL 3817401, at *6 (D.N.H. Aug. 14, 2019) (the ALJ did not err in relying on a non-examining source's opinion that was based on an incomplete record where the ALJ independently considered subsequent treatment notes); Marino v. U.S. Soc. Sec. Admin., 2018 DNH 191, 2018 WL 4489291, at *6 (D.N.H. Sept. 19, 2018) (same); Ferland, 2011 WL 5199989, at *4 (same).

### 7.   Dr. Widness

The ALJ extended "little weight" to the opinion of treating physician Dr. Widness, who indicated that Prybylski could not

---

[7]    The ALJ stated that she found the opinion of Dr. Fuess more persuasive than Dr. Kaplan's.   Tr. 830.   This appears to be a clerical error, as Dr. Fuess testified about Prybylski's mental impairments.   Because Dr. Pella was the only other independent medical expert who testified concerning Prybylski's physical impairments, and the ALJ gave his opinion "great weight," the court believes that the ALJ was referring to his opinion.

work longer than four hours per day due to physical impairments.
The ALJ reasoned that his opinion was inconsistent with the
objective medical evidence, which shows mostly normal
neurological findings.  Tr. 834.  Dr. Widness' own treatment
notes, the ALJ remarked, consistently record normal gait, normal
neurologic exams, normal reflexes, full motor strength, intact
sensation, and no reported issues with balance.  Tr. 834.  Those
are "good reasons," supported by the record, to discount his
opinion.  See 20 C.F.R. § 404.1527(c)(2).

As the Commissioner notes, Dr. Widness' opinion is also
inconsistent with the findings of an occupational specialist to
whom Dr. Widness referred Prybylski for an evaluation in
September 2013.  That evaluator concluded that she could "do
more physically at times than was demonstrated" during testing,
and that "[o]verall test findings, in combination with clinical
observations, suggest that considerable question should be drawn
to the reliability and accuracy of [Prybylski's] reports of pain
and disability."  Tr. 1431-32.  Similarly, Dr. Widness' opinion
is incompatible with the January 2013 examination performed by
Gregory Zuercher, D.O., at the request of one of Prybylski's
providers.  He concluded that she was "quite functional," had
good movement and good strength in the lower extremities, and
did not require any intervention beyond physical therapy.  Tr.
468.  In light of the conflicting evidence, the ALJ did not err

in giving little weight to Dr. Widness' opinion. Cf. Larck v. Barnhart, 110 F. App'x 146, 147 (1st Cir. 2004) (treating source's opinion was not entitled to controlling weight where it was "plainly inconsistent with or unsupported by contemporaneous findings made by the same and other physicians"); Falcon-Cartagena v. Comm'r of Soc. Sec., 21 F. App'x 11, 12–13 (1st Cir. 2001) (upholding the ALJ's decision to discount a treating doctor's opinion that was "inconsistent with other evidence in the record including treatment notes and evaluations performed by both examining and non-examining physicians").

### 8. Dr. Albert

The ALJ gave "little weight" to the opinion of treating rheumatologist Dr. Albert that Prybylski could work only four hours per day and required the ability to frequently change position. The ALJ gave "good reasons" for discounting his opinion. See 20 C.F.R. § 404.1527(c)(2).

The ALJ reasoned that Dr. Albert's opinion was conclusory and lacked objective evidentiary support. She explained that Dr. Albert provided no clinical justification for limiting Prybylski to just four hours of work. Tr. 834; see 20 C.F.R. § 404.1527(c)(3). The ALJ also discussed how his opinion was not supported by his own treatment notes, which reflect consistently normal neurological exams and unremarkable findings, apart from reports of tender trigger points and the

36

doctor's observation of Raynaud's syndrome and hypermobility.
See, e.g., Tr. 1608-10, 1617, 1955.  Indeed, Dr. Albert noted
that Prybylski's past medical history was "unremarkable," Tr.
1506, described her fibromyalgia as "mild," Tr. 1607, stated
that an echocardiogram for the Ehlers-Danlos syndrome was
"completely normal," Tr. 1608, and noted that her hip pain was
"confusing" because both her MRI and X-ray imaging were "normal"
but she reported that a lidocaine injection in her hip "was
helpful."  Tr. 1955.  Lastly, the ALJ noted that Dr. Albert's
limitations were inconsistent with records showing that
Prybylski had been actively looking for jobs, including in
martial arts and crafting.  Tr. 834.  The evidence that the ALJ
cited is "adequate" to persuade a "reasonable mind."  See
Irlanda Ortiz, 955 F.2d at 769 (internal quotation marks
omitted).

### D.   Vocational Expert Testimony

At step five of the sequential analysis, the ALJ relied on
vocational expert ("VE") testimony to find that jobs existed in
significant numbers in the national economy that Prybylski could
perform, such as a surveillance system monitor, fishing-reel
assembler, and addresser.  Prybylski challenges the VE's
testimony on multiple grounds.  None has merit.

First, Prybylski maintains that the ALJ did not resolve an
inconsistency between the testimonies of two different VEs.  One

VE testified at a hearing in April 2015 and the other testified
at a post-remand hearing in February 2018.  The ALJ's
hypothetical question to both VEs included a limitation that the
individual needed 5-minute breaks from sedentary work during
non-break hours.  The first VE testified that most employers
would not tolerate such breaks.  Tr. 194.  The second VE
identified three jobs that would accommodate the limitation.
See Tr. 935.  The ALJ, however, clarified to the second VE, but
not to the first, that the reason for the limitation was to
allow the individual to move around after sitting for an hour,
and that "the job itself may include periods of moving around"
to satisfy this restriction.  See Tr. 935.  As the ALJ in effect
changed the hypothetical limitation when she posed it to the
second VE, there is no conflicting testimony on this point.

Prybylski next challenges each of the jobs that the second
VE identified.  With respect to the surveillance system monitor
job, she claims that it is inconsistent with the ALJ's RFC
finding.  The VE testified that he had observed the job being
performed in the lobby of the hearing office building.  See Tr.
940-41.  Prybylski contends that, as performed in that building,
the job requires interaction with the public and significant
patrolling of the grounds.  But the fact that some jobs in this
category, as performed at a particular workplace, may be
incompatible with Prybylski's restrictions does not mean that

all such jobs are, nor does it preclude the ALJ from relying upon the job category at step five.  See, e.g., McCoy v. Astrue, 648 F.3d 605, 617 (8th Cir. 2011) ("The VE did not suggest [the claimant] would be able to perform each and every job in the categories he mentioned, nor was he required to identify a category in which [the claimant] could perform all of the jobs."); Wheeler v. Apfel, 224 F.3d 891, 897 (8th Cir. 2000) (the ALJ supportably relied upon a VE's testimony that the claimant could perform certain jobs within specified job categories, although she could not perform all such jobs). Indeed, the Dictionary of Occupational Titles ("DOT") itself cautions that its descriptions "may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities." DOT, "Special Notice," 1991 WL 645963 (4th ed. 1991).

To the extent Prybylski argues that the VE's testimony about this job conflicts with the DOT's definition, the ALJ concluded that the two are consistent, and the court agrees. The VE testified that the surveillance system monitor job is performed in a variety of settings, including rehabilitation facilities and retail stores, in addition to public transportation terminals described in the DOT.  Tr. 940; see DOT § 379.367-010.  In effect, the VE applied his expertise to include in the job numbers additional workplaces consistent with

39

the DOT's definition of the job requirements.  That does not create a conflict between the VE's testimony and the DOT.[8]

Next, Prybylski alleges that the VE did not offer a justification for his job numbers for the addresser position. This is inaccurate.  The VE testified that he obtained the job numbers from SkillTRAN's Job Browser Pro software.  Tr. 936-37. As the First Circuit observed, "SkillTRAN's software has been recognized by at least one district court to be widely relied upon by vocational experts in estimating the number of relevant jobs in the national economy."  Purdy, 887 F.3d at 14.

Finally, Prybylski contends that the fishing-reel assembler job is inconsistent with the ALJ's RFC finding because the VE testified that the work is moderately paced, with a quota.  See Tr. 944-45.  That limitation, however, is consistent with the ALJ's limitation precluding "fast-paced" work, meaning no "belt-paced or timed work."  See Tr. 933-34.  Accordingly, all of Prybylski's step five challenges fail.[9]

---

[8]    But even if such a conflict existed, the ALJ's error would be harmless because she identified two other jobs that Prybylski could perform.  See Lambert v. U.S. Soc. Sec. Admin., 2018 DNH 187, 2018 WL 4215015, at *7 (D.N.H. Sept. 5, 2018) (holding that the ALJ's failure to resolve a conflict between VE testimony and the DOT concerning one job constituted harmless error where the ALJ cited two other jobs the claimant could perform).

[9]    In one sentence in her brief, Prybylski notes that none of the jobs the VE identified "were done in semi-isolation, as suggested by Dr. Landerman . . . and it was not possible to guarantee a supervisor who was not overly critical."  Doc. No.

## IV.  **CONCLUSION**

For the aforementioned reasons, Prybylski's motion for an order reversing the Commissioner's decision (Doc. No. 8) should be denied, the Commissioner's motion for an order affirming his decision (Doc. No. 10) should be granted, and the clerk of the court should be directed to enter judgment in favor of the Commissioner and close the case.

Any objection to this Report and Recommendation must be filed within 14 days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  The 14-day period may be extended upon motion.  Failure to file a specific written objection to the Report and Recommendation within the specified time waives the right to appeal the district court's order.  See Santos-Santos v. Torres-Centeno, 842 F.3d 163, 168 (1st Cir. 2016).

Andrea K. Johnstone
United States Magistrate Judge

December 12, 2019

cc:  Elizabeth R. Jones, Esq.
     Candace H. Lawrence, Esq.

---

8-1 at 25.  As she did not adequately develop the argument, it suffices to say that the ALJ gave only partial weight to Dr. Landerman's opinion and assigned greater weight to the opinions of psychologists who examined Prybylski or reviewed the entire record.  See Tr. 831-32.